MARVIN, Chief Judge.
In this action for personal injury damages arising out of a high voltage electrical shock, plaintiff Ball appeals a judgment based on a jury verdict which found no fault or negligence on the part of the defendant utility, BREMCO.
*1383 Ball contends that the jury’s verdict was clearly wrong and that the trial court erred in admitting lay and expert testimony relating to the conduct or fault of Ball’s employer, Bellevue Cablevision, Inc., for whom Ball was working on a BREMCO utility pole when he was injured in 1985. The testimony complained of was admitted with a limiting instruction. The court explained that the jury would not be asked or be able to assign fault to Bellevue but that the testimony about Bellevue’s conduct could be considered by the jury in determining whether BREMCO was negligent or at fault in its conduct.
Finding the verdict not clearly wrong and the testimony admissible, we affirm the judgment. Gauthier v. O’Brien, 618 So.2d 825 (La.1993); Guidry v. Frank Guidry Oil Co., 579 So.2d 947 (La.1991).
FACTS
Ball’s injury occurred February 8,1985, on a BREMCO pole, no. 1277, on which were installed “knifeblade” switches that were energized with 7200 volts. Bellevue contracted with BREMCO to string its cable television lines on BREMCO utility poles. The contract required Bellevue to comply with the National Electrical Safety Code. Testimony explained the method of stringing. A “messenger” or support cable is first strung on poles along the selected route for the coaxial service cable. Thereafter the coaxial cable wire is “lashed” to the supporting messenger cable.
Before his accident Ball had climbed pole 1277 to string the messenger cable. Ball’s father, who was the owner-manager of Belle-vue, determined the 12placement of the messenger cable, thus approving the distance between that cable and BREMCO’s transmission equipment on the pole.
When Ball began to climb the pole to lash the coaxial cable, his father cautioned him to work the pole from the “road side,” which was the side opposite the closest knifeblade switch. Ball did not heed his father’s caution. He climbed the road side of the pole. We reproduce from the record this photo and diagram of the pole:
*1384 [[Image here]]
*1385 -[¿CONFIGURATIONS DISTINGUISHED
Expert testimony explained the function and purpose of knifeblade switches as “inter-ties” or “tie-ins,” to be distinguished from “two-way feeds:”
An electrical distribution system such as BREMCO’s consists of several circuits served by a substation. The circuits of each substation are not often connected with those of another substation. Each substation supplies electricity to its circuit or circuits. Where circuit lines of one substation reach a pole on which circuit lines of another substation are installed, the two circuits may be connected or joined by use of the knifeblade switches when particular circumstances make the connection necessary. The switches are normally “open” with the knifeblade down and not in contact with that part of the switch attached to the other circuit. The electricity in one circuit does not pass to the other circuit under normal circumstances, but each circuit is energized by the electricity that comes from its respective substation. If necessary because of maintenance or malfunction of a line or substation, the electricity in one circuit may be fed into or connected to serve the other circuit simply by “closing” the knifeblade switch, joining the two circuits together to be served by one substation. The circumstances where knifeblade switches are installed are called “inter-ties” or “tie-ins,” the purpose of which is to avoid interrupting customer service and yet allow for maintenance and malfunction of transmission equipment. BREMCO’s experts explained that all electrical transmission utilities use the tie-in configuration. BREMCO has 187 poles that are so equipped. Pole 1277, however, was the only tie-in pole among the poles that were leased by BREMCO to Belle-vue.
The circumstances where lines from one circuit’s substation are purposefully and directly joined on a pole with lines from another circuit’s substation, without thejjuse of knifeblade switches, are called “Two Way Feeds.” While distinguishable, both circumstances (the tie-in and the two-way feed) are said to be common, safe and proper in the electrical transmission industry. Warning signs (Danger, Two Way Feed) are posted atop the poles on which the lines are two-way feeds, but not atop poles on which the lines are tie-ins. Six of the poles in the BREMCO system, which were two-way feeds, were identified by Ball as having the warning sign atop the pole, “Danger, Two Way Feed.” Two two-way poles were among the poles BREMCO leased to Bellevue. Ball had climbed the two two-way poles to string the supporting messenger cable.
We reproduce from the record this photograph showing the configuration of a two-way feed pole and warning sign to distinguish the two-way configuration from the configuration of a tie-in pole.
*1386 [[Image here]]
| r/The experts also explained that proximity and not contact with high-voltage electricity is the real danger posed to a lineworker. If a worker comes within one inch of an energized 7200 volt line or either part of an “open” knifeblade switch at a tie-in, electricity will arc to the worker, causing injury or electrocution.
Ball said that when he saw the knifeblade was unconnected, “open” or hanging down, indicating to him a “break” in the circuit, he assumed, however mistakenly, the knifeblade was not energized. He contends that BREMCO should have posted the two-way feed or a similar warning sign atop the tie-in pole to alert him to the danger.
The applicable safety requirements (NESC) mandated that a lineworker maintain a 40” distance from BREMCO’s switches and lines unless the lineworker and his *1387 equipment are properly insulated. Unfortunately, Bellevue’s messenger line had been initially installed only 9⅜” below the plane of the BREMCO open knifeblade at the tie-in. Bellevue obviously did not comply with its contractual requirements.
Although Ball’s father and his brother-in-law, Mitchell Odom, were near the pole, neither observed what Ball did atop the pole or how he positioned himself. Hearing the noise generated by the shock, they looked up to see Ball slumped over with electricity arcing from the pole to his body. Odom saw Ball’s hard hat falling to the ground. Together, they removed Ball from his predicament, thereafter aiding him as much as possible and calling for medical attention.
DISCUSSION
The jury obviously accepted as credible the testimony of BREMCO’s experts, discounting the testimony of Ball and his expert which conflicted in critical respects. Ball’s expert, Greene, opined that BREM-CO’s configuration on pole 1277 ^violated both the National Electrical Safety Code (NESC) and the National Electric Code (NEC) and that some kind of sign should have been atop the pole to warn those not employed by BREMCO that the knifeblade switch was energized. Alternatively, Greene described in detail a different configuration BREMCO could have used on the pole to avoid the knifeblade being energized except when closed. BREMCO’s experts disputed Greene’s opinion that industry standards required an open knifeblade to be deenergized.
Equating the tie-in poles to the two-way feed poles, Greene opined that the presence of the warning signs on two-way poles and not on the 1277 pole created a trap for Ball. At oral argument, counsel for Ball effectively agreed that had there been no warning signs on any pole, industry standards would not have imposed a duty on BREMCO to warn that the open knifeblade on pole 1277 was energized.
BREMCO’s expert, Drake, testified a warning sign on pole 1277 would be misleading because the two-way poles with warning signs presented unusual or distinct situations while a tie-in pole such as 1277 did not. BREMCO’s expert, Brooks, gave two reasons why the NEC did not apply: First, Bossier Parish had not formally adopted the Code so as to make it applicable and secondly; by the Code’s own provisions and even when enacted by a governing body, the Code does not apply to other utility suppliers such as BREMCO, but to the customers of the utility’s service.
Drake stated the alternative design described by Greene was neither practical nor feasible for three reasons: (1) the presence of more equipment on a pole left less work room for those authorized to be on the pole, making the pole more hazardous; (2) the increased cost of equipping a pole would be passed on to the consumer resulting in higher electric bills; and (3) the physical structure used to |7house the equipment would have to be enlarged. Brooks described the alternative design offered by Greene as a redundant effort at considerable cost which would accomplish nothing. Brooks said that Greene’s opinion that industry standards required the open knifeblade to be deenergized showed that Greene did not know much about the electrical transmission industry.
Ball’s assignment that the jury verdict is clearly wrong is meritless. Ball’s action sounds in negligence. Negligence is, by definition, conduct which breaches a legal duty owed by a defendant to a plaintiff and causes in fact injury to plaintiff. Weaver v. Valley Electric, 615 So.2d 1375 (La.App. 2d Cir. 1993).
Ball asserts that BREMCO owed Ball a duty to warn about the situation on pole 1277 that was created by the presence of warning signs on the two-way poles and, alternatively, a duty to lessen the risk posed by pole 1277 by using a different configuration of equipment. The only evidence, or source, of the asserted duty owed by BREMCO to Ball was presented in the form of expert testimony, concerning which NEC or industry standards were applicable to BREMCO under the circumstances. The jury was presented with conflicting expert testimony. The manner in which this issue was presented became a credibility question for the trier of fact. See Thomas C. Galligan, A Primer on the Pat *1388 terns of Negligence, 53 La.L.Rev. 1509 (1993). The jury had the prerogative and responsibility of determining the credibility of the conflicting expert opinions. Where there are two permissible views of the evidence, the factfinder’s choice between them cannot be manifestly erroneous. Stobart v. State Through DOTD, 617 So.2d 880 (La. 1993); Rosell v. ESCO, 549 So.2d 840 (La. 1989). Unless found clearly wrong, manifestly erroneous, the findings of the trier of fact will not be disturbed on appeal. Sistler v. Liberty Mut. Ins. Co., 558 So.2d 1106 (La. 1990). On this record we cannot find the jury’s verdict clearly wrong.
THE ADMISSIBILITY ISSUE
We cannot agree that Civil Code Article 2324, before its amendment in 1987, precluded the finder of fact from hearing any relevant evidence pertaining to the conduct or negligence of a statutorily immune employer. Instead, we conclude the prior Art. 2324 allowed the finder of fact to consider the employer’s conduct, if relevant to other issues in an industrial accident, without determining or quantifying the fault of that conduct.
Ball made a motion in limine seeking to exclude any evidence of Bellevue’s negligence, relying on Art. 2324 and Guidry v. Frank Guidry Oil Co., supra. The trial court denied the motion, saying the jury should hear the evidence, subject to the court’s limiting instruction about how that evidence could be used by the jury if such an instruction was necessary. On Ball’s request, immediately after BREMCO’s counsel had begun eliciting testimony concerning whether Bellevue’s conduct was negligent, the court instructed the jury:
[I]n the ultimate resolution of this case when you are called on to render a verdict uh — the issue will be whether or not the defendants in this law suit are at fault. The Bellevue Road Cable TV Company is not a defendant in this law suit and you will not be able — you will not be asked to or be able to render a uh — verdict in this case which will assign fault to the Bellevue Road Cable TV Company. Their fault is not at issue in this law suit. I have indicated to counsel in chambers in pre-trial conference that I would permit testimony such as Mr. Tutt is eliciting at this time. And this testimony may be considered by you in your determination of fault on the part of the defendant in this law suit. But I will instruct you later that the issue of fault on the part of Bellevue Cable TV Company is not an issue on which you’ll be asked to render a verdict.
In the court’s final instructions, the jury was again told it could not assign any percentage of fault to Bellevue Cablevision.
| ¡jBall urges that any evidence of Bellevue’s conduct or negligence should have been excluded because of its prejudicial nature and tendency to confuse the jury. Ball claims the court’s limiting instruction was insufficient to keep the jury from tacitly quantifying Bellevue’s fault, thus negating BREM-CO’s fault.
Before its 1987 amendment Art. 2324 stated:
He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in soli-do, with that person, for the damage caused by such act.
Persons whose concurring fault has caused injury, death or loss to another are also answerable, in solido; provided, however, when the amount of recovery has been reduced in accordance with the preceding article [concerning comparative negligence], a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of negligence has been attributed, reserving to all parties their respective rights of indemnity and contribution.
The 1987 amendment restricts solidarity among two or more tortfeasors only to the extent necessary for a victim to recover fifty percent of his or her recoverable damages. The amendment includes this language: “... a joint tortfeasor shall not be solidarily hable with any other person for damages attributable to the fault of such other person, ... regardless of such other person’s ... immunity by statute or otherwise.”
*1389 The 1987 amendment has been interpreted as overruling Guidry, supra, to the extent that Guidry precludes allocation of employer fault, which allocation after the 1987 amendment is mandatory. Gauthier v. O’Brien, supra. Ball suggests that Guidry stands for the proposition that a jury should not hear evidence of the conduct or negligence of a statutorily immune employer in a suit against a third party tortfeasor. Guidry specifically held it was error to allow a jury to quantify the fault of a statutorily immune employer. The Guidry court actually discussed the jury’s finding of the employer fault (10 percent), but then prorated that fault among the I loplaintiff and the third party tortfeasor. Here, the limiting instructions admonished the jurors not to quantify Bellevue’s fault. Even if we had the presence of other non-immune defendants among whom fault could be allocated in Ball’s action, we have agreed in our initial analysis that BREMCO was not at fault, and would not include BREMCO among the defendants at fault.
The Code of Evidence makes all relevant evidence admissible unless otherwise inadmissible under the United States Constitution, the Louisiana Constitution, the Code of Evidence itself or other legislation. LCE Art. 402. Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice or confusion of the jurors, among other dangers. LCE Art. 403. Evidence of Bellevue’s conduct and expert opinion about that conduct falling below industry standards or being negligent was relevant. Ball does not argue to the contrary. Instead he urges that this evidence should have been excluded because it was prejudicial and confusing to the jury. An exclusion of relevant evidence on such grounds is usually recognized to be within the discretion of the trial court. Hebert v. Angelle, 600 So.2d 832 (La.App. 3d Cir.1992), writ denied. No abuse of that discretion is demonstrated or found.
DECREE
At appellant’s cost, the judgment is AFFIRMED.