339 So.2d 498 (1976)
Mrs. Verna M. Davis GANSLOSER, Plaintiff-Appellant,
v.
KANSAS CITY SOUTHERN RAILWAY COMPANY et al., Defendants-Appellees.
No. 13036.
Court of Appeal of Louisiana, Second Circuit.
November 1, 1976.
Rehearing Denied December 6, 1976.
Writ Refused February 14, 1977.
*499 Skeels, Baker & Coleman by Donald L. Baker, Shreveport, for plaintiff-appellant.
Wilkinson, Carmody & Peatross by Samuel W. Caverlee, Shreveport, for defendant-appellee Kansas City Southern Ry. Co.
Bodenheimer, Jones, Klotz & Simmons by G. M. Bodenheimer, Jr., Shreveport, for defendant-appellee Trinity Universal Ins. Co.
Before PRICE, HALL and MARVIN, JJ.
En Banc. Rehearing Denied December 6, 1976.
PRICE, Judge.
This is a tort action brought by the owner of property adjoining a railroad track to recover damages caused by a train derailment after application of emergency brakes to avoid a motorist.
The principal question on appeal is whether the railroad is solidarily liable with the motorist's insurer for the damages to plaintiff's property under the application of the doctrine of strict liability of La.C.C. Article 667.
Verna M. Davis Gansloser is the owner of the residential property at 2916 Southern Avenue on the east side of the Kansas City Southern Railway Company's right-of-way north of its intersection with Ockley Drive in Shreveport. The railroad maintains two mainline tracks and a spur track on its right-of-way in this area. On August 17, 1975, Thelma S. Tyler was operating her automobile in an easterly direction on Ockley and stopped at the railroad track for a northbound train to pass on the east mainline track. Immediately after it cleared the intersection, she started across the west main track on which a southbound freight was approaching some 250 feet north of the crossing. On seeing the approaching train, Mrs. Tyler stopped the automobile on the track, jumped out, and ran to the passenger side in an apparent attempt to assist a guest passenger from the car. The engineer on the train made a emergency application of brakes to avoid a collision with the Tyler vehicle. The sudden braking caused the rear cars of the 168 car train to collide with cars nearer the front resulting in a derailment of several cars and a collision with the Tyler vehicle. The derailed cars collided with cars of the northbound train on the parallel track causing several of these cars to derail, leave the right-of-way, and cause substantial damage to the residence of Mrs. Gansloser.
Mrs. Gansloser filed this suit against the insurer of the Tyler vehicle, Trinity Universal Insurance Company, and the Kansas City Southern Railway Company for damages to her property.
The railroad denied liability contending the damage to the Gansloser property was caused solely by the negligence of Mrs. Tyler.
In a separate action which was consolidated with this suit for trial, the railroad seeks to recover from Trinity Universal the damages to its train equipment resulting from the negligence of Mrs. Tyler, who was killed in the accident.
*500 Aetna Casualty and Surety Company, the insurance carrier on the Gansloser property, intervened to enforce its subrogation rights against any recovery by Mrs. Gansloser for the amount it paid under its policy.
Prior to trial of the cases, Trinity Universal deposited the policy limits of $5,000 plus interest and accrued court costs in the registry of the court.
Following trial of the merits, the court rejected Mrs. Gansloser's demand against the railroad, and rendered judgment in favor of each party against Trinity Universal. The court prorated the deposited money between Mrs. Gansloser and Kansas City Southern Railway Company according to the damage each suffered. Mrs. Gansloser sustained damages of $13,990 and was awarded $401.57. The railroad suffered damages of $166,412 and received a $4,776.73 award.
Mrs. Gansloser has appealed from the judgment rejecting her demands against the railroad contending that the trial court was in error in finding that the sole cause of the damage to her property was the negligence of Mrs. Tyler, and in failing to properly apply Article 667 to the circumstances of this case.[1] She concedes in brief that the evidence presented on trial did not show that the train derailment resulted from any specific act of negligence on the part of the train crew, but was caused by the normal operation of the braking system. She contends the railroad is liable without proof of negligence as under Article 667 strict liability results from its activities which caused harm to her as a neighbor of the railroad right-of-way.
The railroad contends this article has no application to the operation of a railroad where the intervening negligence of a third party has caused damage. It relies on the case of Town of Jackson v. Mounger Motors, 98 So.2d 697 (La.App. 1st Cir. 1957), and a later federal case following its holding, Bianchini v. Humble Pipe Line Company, 480 F.2d 251 (5th Cir. 1973). These cases were cited by the trial judge in his reasons for refusing to subject the railroad to the rule of strict liability.
The Mounger decision stemmed from the taking of a used car without permission from a car lot adjacent to the City Hall in Jackson. The unauthorized driver backed into the fire hall causing damages. The appellate court found the strict liability of Article 667 inapplicable because the use of the car lot was not inherently dangerous, nor was there a reasonably foreseeable chance of harm. The opinion further indicated the doctrine was inappropriate when the damage resulted from an unforeseen intervening agency.
Bianchini was concerned with a break in an oil pipe line caused by an unknown ship running aground in an unofficial channel resulting in damage to oyster farmers. The federal circuit court, citing Mounger, refused to hold the owner of the pipe line liable in the absence of a finding of negligence, holding that strict liability is inapplicable when there is an unforeseeable intervening cause. Appellant argues the intervening cause in this case (Mrs. Tyler's negligence) was foreseeable by the railroad, and therefore, strict liability should apply even under the Mounger decision. This argument is based on the theory that there is a reasonable danger that a motorist will stall on a rail crossing causing the emergency application of brakes which poses a foreseeable possibility of derailment.
The fallacy of appellant's argument lies in the fact that these are only possibilities and not probabilities of occurrences. Motorists do sometimes stall on a railroad track. However, this is an unusual event. The possibility of a derailment being caused by emergency braking is shown by the evidence to be less than one per cent when a train is placed in emergency. This rate of occurrence does not render such an event reasonably foreseeable.
*501 There is no showing the railroad could have done anything to have prevented this type of an accident from occurring. There was no defective track. The train was traveling at a speed of approximately 16 miles per hour at the time it was thrown in emergency. The engineer was alert and acted promptly. Except for the forward movement of the rear cars, he would have avoided a collision and the loss of Mrs. Tyler's life.
The sole justification for applying strict liability to the facts of this case would be to shift the economic burden of loss from a completely innocent abutting property owner to the railroad company who may possibly be in the position to pass on such losses to the public in increased freight rates. There is no present authority on which we may rely to reach such a result.
The trial judge was correct in rejecting the demands of appellant and intervenor against the railroad and the judgment appealed is affirmed at appellant's costs.
MARVIN, J., dissents and assigns written reasons.
MARVIN, Judge (dissents).
I respectfully dissent, not only as to the result but as to the approach of the majority in reaching that result.
The majority has accurately stated the critical factual structure, but there are pertinent details which should not have been pruned away and which, in my humble mind, enlighten and may change the ultimate result.
This diagram reasonably depicts the crossing in question:

When the late Mrs. Tyler, proceeding easterly on Ockley Drive, stopped at the crossing a KCS train was proceeding northbound on the north mainline track (Track (1) on diagram). We are not informed of the speed of this train, but can easily deduce it was probably going faster than 16 mph, the speed of the southbound KCS train. The northbound train contained 150 cars.
Plaintiff's residence was more than one-half mile north of the crossing. Six miles north of the crossing was the KCS yards where, shortly before the derailment, the southbound train was made up, containing 168 cars. On the "head end" (next to the locomotive) the southbound train had 128 "empties" (unloaded cars). Most of the remaining cars were loaded with grain.
The two mainline tracks ((1) and (2) on the diagram) parallel each other from KCS yards for several miles through the City until they merge into one track about a mile south of the Ockley Drive crossing.
*502 When the northbound train cleared the crossing the southbound train was several hundred feet away from the crossing. Mrs. Tyler then drove onto the crossing, panicked and stopped her automobile on the southbound track. The engineer saw what occurred and went into the emergency stop. The train traveled 250 feet in emergency and had almost stopped when it collided with the car. The "slack action" of the train only one or two seconds later and after the initial collision was over, caused the train to "lunge" forward approximately 25 feet.
This slack action force caused the derailment of several cars about 60 car lengths or 3,000 feet behind the locomotive. The derailment of these cars on Track (2) caused the derailment of northbound cars on Track (1) which crashed into plaintiff's residence.
From several of the railroad witnesses (Road Foreman of Engines, Roadmaster, Engineer, fireman, conductor, all of several years experience) we learn about this phenomena.
The slack action effect is well known to railroaders. When cars are connected to make up a train, there is three or four inches of slack in each connection. When the train gets underway, the locomotive is pulling the cars. This "stretches out" the train or the "slack" so to speak. When the engineer puts a train into an emergency stop, the locomotive and the cars immediately behind are the first ones which are braked. In an emergency stop, the air brake system of the train actually releases its air from car to car with the end of the train being braked several seconds after brakes are applied on the front of the train. In this case, the Road Foreman of Engines (Supervisory Engineer), expert witness, estimated on this train of 168 cars it took 9.65 seconds for the "emergency to reach the end of the train" (the air to exhaust and brake the cars). This time was reached by dividing the speed or velocity of the exhausting air (900 feet per second) into the length of the train (8,683 feet). The slack action produced 9,000 tons of impact to the locomotive and caused it to lunge 25 feet forward after it had collided with the automobile and had then stopped. This slack action impact, and not the collision with the automobile, caused the derailment of the southbound train. All railroad witnesses agree to or assert this.
But as the majority observes, a derailment does not always occur in an emergency when a train is placed into an emergency stop. The railroad witnesses generally agreed that they experience five or six emergency stops each month (approximately 50-60 a year) from ruptured hoses and other mechanical failures and one or two emergency stops a year intentionally done by the engineer. In all of these stops, they experience a derailment about once a year. One derailment in 50 emergency stops would be a two percent occurrence factor.
We also learn that a derailment is more likely to occur when the emergency (broken air hose or intentional application of emergency stop) occurs at the front of the the train.[1] A derailment is also more likely to occur when the front of the train is going uphill and the rear is going downhill and when a string of empty cars is placed ahead of loaded cars. The length of the train is a greater factor than is speed.
In the instant case, the southbound train was in three positions, according to the Road Foreman of Engines. Its front end was going slightly uphill. Its rear end was going slightly downhill and some of the cars in between were relatively on level terrain.
This testimony of the southbound engineer is important:
". . . we had orders to meet another train and we stopped at St. Vincent [street north of the Ockley Drive crossing] and waited there not to block any crossing . . . waiting on [the northbound train] to show up. * * * We had a train order to wait at Hollywood Avenue which is at the end of the double track [60 car lengths or 3,000 feet south *503 of the Ockley crossing], but we have to wait back to keep from blocking crossings while we wait."
A "wait" of only a few seconds or minutes longer at St. Vincent Street, only a few blocks from Ockley Drive, would have allowed the northbound train to have clearly passed while the southbound train was stopped.
We have then these factors in this case:
(1) Intentional emergency stops are not uncommon, but expected and are more likely to occur in the city than in rural areas.
Derailments are more likely to occur:
(2) When the train is lengthy;
(3) When empties are in front of loaded cars;
(4) When the terrain which is being traversed is of a concave configuration; and
(5) A derailment of one train of 168 cars is more than likely to cause a more damaging and widespread derailment of a passing train of 150 cars on parallel tracks in close proximity. When one train is stopped, the risk of a damaging and widespread derailment is considerably lessened.
The majority says this plaintiff "abandoned" her contention as to the doctrine of res ipsa loquitur and her allegations that the railroad was negligent in failing to maintain its equipment in such condition so that an emergency stop could be made without a derailment. The plaintiff's first specification of error reads, however:
"(1) The Court erred in finding as a fact that the sole cause of the damage to plaintiff's residence was the act of the motorist in stopping her vehicle in the path of the train, when the evidence shows that the train is so constructed that upon an emergency application of its brakes, it is likely to derail."
While the specification does relate to "fact," its effect is legal because the issue is causation which is both a factual and a legal inquiry. Dixie Drive It Yourself System v. American Beverage Co., 242 La. 471, 137 So.2d 298, and Malone, Ruminations [thereon], 30 La.L.R. 363 (1970); Laird v. Travelers Ins. Co., 263 La. 199, 267 So.2d 714, 720 (1972).
"Foreseeability" as such, should neither be the approach nor the exclusive test of determining whether the railroad was negligent or determining the extent of the railroad's liability in this case.[2] Since the majority, however, has considered this case in that light, I must respectfully disagree with the majority's statement that the "rate of occurrence [`possibility v. probability'] does not render such an event [a derailment] reasonably foreseeable." This record clearly establishes that one or two derailments from the slack action effect in every 50 or 60 emergency stops are expected to occur. In a case in this court which employed a proximate cause approach to facts which were characterized as "imponderable. . . overwhelmingly against the laws of probability . . . unusual . . . [and] stranger than fiction . . .,[3] it was stated:
"`"The fact is, that the consequences of negligence are almost invariably surprises. *504 A man may be negligent in a particular matter a thousand times without mischief; yet, though the chance of mischief is only one in a thousand, we would continue to hold that the mischief, when it occurs, is imputable to the negligence."'
* * * * * *
"We do not believe that the theory of foreseeability is applicable to the facts of this case. Referring again to the Restatement of the Law of Torts, we find in Section 435 a plain and unambiguous statement of the principle which refutes the requirement of foreseeability: `If the actor's conduct is a substantial factor in bringing about harm to another, the fact that the actor neither foresaw nor should have foreseen the extent of the harm or the manner in which it occurred does not prevent him from being liable.'" Lynch v. Fisher, La.App., 34 So.2d 513, 518 & 519.
The trial court made these observations:
". . . [Plaintiff's contention of foreseeability] stems from the testimony herein that in emergency stops, intentional or instrumental, there always exists the possibility of a derailment and that this was thus a computable hazard of loss that a railroad property owner should bear as any other cost of doing business.* "* This was a foreseeable accident, but such are inevitable in railroading according to this record and, if attributable solely to the negligence of third persons, it is nonpreventable so far as the railroad is concerned. If the burden of such an accident is to be imposed on the railroad (or any property owner in a proper case), it involves a matter of policy that should be declared only by an Appellate Court."
Recognizing, and I hope avoiding, the temptation of the privilege afforded me to dissect and argue against each sentence of the majority opinion with which I may have some disagreement, I choose instead to proceed to what I believe is the more proper approach and the more pertinent inquiry into this case.
It is clear that more than one cause can, and frequently does, contribute to a particular injury. See Dixie, supra, at page 302. I believe the factors mentioned, length of trains, positioning of the cars, etc. constituted negligent conduct on the part of the railroad which created an unreasonable risk of harm to the plaintiff houseowner in this case.
"Negligent conduct is a cause-in-fact of harm to another if it was a substantial factor in bringing about that harm." Ibid. The two trains were lengthy. Empty cars were placed ahead of loaded cars. The terrain was conductive to a derailment in the event an emergency stop did arise at the Ockley Drive crossing. The combined speed and passing movement of two trains enhanced the consequences or made more likely the departure of a derailed car from the right of way onto the plaintiff's residence. The cumulative effect of these factorseach of which was exclusively controlled by the railroadin my opinion was negligence within the concept of our civil code.
In this respect and employing the duty-risk approach, these questions are pertinent:[4]
Was the conduct complained of A cause-in-fact?
Was the railroad under a legal duty imposed to protect against the risk of injury from derailment to adjoining property owners?
Was the railroad's conduct negligent, substantial, blameworthy? Or, if not, is some concept of strict liability applicable where an innocent third party is injured?
The latter inquiry leads into the "fault" scheme of our civil code. This scheme was well explained by Mr. Justice Tate in Loescher v. Parr, 324 So.2d 441, 445 ff. (La.1975) in these words:
"Articles 2315 through 2324 of the Louisiana Civil Code comprise the code's entire chapter of legal principle regulating offenses and quasi-offenses.
"The underlying principle is provided by Article 2315: `Every act whatever of man that causes damage to another obliges *505 him by whose fault it happened to repair it. * * *' The remaining articles constitute amplifications as to what constitutes `fault' and under what circumstances a defendant may be held liable for his act or that of a person or thing for which he is responsible.
"Article 2316 provides for delictual (tort) responsibility for negligent acts or omissions: `Every person is responsible for the damage he occasions not merely by his act, but his negligence, his imprudence, or his want of skill.' However, negligence is not necessarily a basis for the obligation to respond in damages for harm caused by persons or things for which we are responsible as provided by the subsequent Articles 2317 through 2322.
* * * * * *
"To summarize the principle of legal fault thus already recognized in favor of an injured person himself without fault: "When harm results from the conduct or defect of a person or thing which creates an unreasonable risk of harm to others, a person legally responsible under these code articles for the supervision, care, or guardianship of the person or thing may be held liable for the damage thus caused, despite the fact that no personal negligent act or inattention on the former's part is proved. The liability arises from his legal relationship to the person or thing whose conduct or defect creates an unreasonable risk of injuries to others. "The fault of the person thus liable is based upon his failure to prevent the person or thing for whom he is responsible from causing such unreasonable risk of injury to others. Thus, the person to whom society allots the supervision, care, or guardianship (custody) of the risk-creating person or thing bears the loss resulting from creation of the risk, rather than some innocent third person harmed as a consequence of his failure to prevent the risk. His fault rests upon his failure to prevent the risk-creating harm and upon his obligation to guard against the condition or activity (by the person or thing for which he is responsible) which creates the unreasonable risk of harm to others.

"This jurisprudence recognizes that the injured person must prove the vice (i.e., unreasonable risk of injury to another) in the person or thing whose act causes the damage, and that the damage resulted from this vice. Once this is proved, the owner or guardian responsible for the person or thing can escape liability only if he shows the harm was caused by the fault of the victim, by the fault of a third person, or by an irresistible force.

"The legal fault thus arising from our code provisions has sometimes been referred to as strict liability.
* * * * * *
"Article 2317 provides: `We are responsible, not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or of things which we have in our custody. This however, is to be understood with the following modifications.'
* * * * * *
"Articles 2315 through 2322 express the same concepts and represent the same scheme as French Civil Code Articles 1382 through 1386, of which they are to a large part verbatim translations. See Articles 2315-17 La.C.C.Comp.Ed. in 17 West's LSA-C.C. pp. 14-21 (1972). In this context, in applying the French verbatim counterpart code provision, the liability of the guardian of a thing for damages caused through the vice or defect of the thing has been interpreted as providing for liability of the guardian without personal negligence on his part, his legal fault (as also in the case of the owner of a building or of an animal) being based upon the breach of his legal obligation to keep his thing in such condition or in such control that it does no damage to others. These interpretations have been reached not only in France but also in Belgium and in Quebec, which like Louisiana adopted a civil code scheme of articles *506 and concepts based almost verbatim on the articles of the French Civil Code.
* * * * * *
"We find no reason why Civil Code Article 2317 should not be interpreted as incorporating a similar concept of legal fault. As with the French, Canadian, and Belgian counterpartseach found in the same code scheme of delictual liability, the code provision for the liability of the owner of a thing for damages caused by its vice would be unnecessary if the basis of code liability thus expressly provided were only for negligence, a basis already provided by the preceding Article 2316 (and its preceding counterparts in the French, Canadian, and Belgian codes).
* * * * * *
"The interpretation of Article 2317 we reach today is more in accord with jurisprudence interpreting companion code articles and with the functional intent of Article 2317 within our Civil Code's general scheme of fault liability." (Emphasis Ours).
The factual circumstances here should be considered in the light of the foregoing principles, with these conclusions or results:
(1) The train had collided (and rather gently) with the automobile and had stopped. The slack action force seconds later, caused the derailment which was made more likely by the actions and omissions of the railroad. In this respect, the make up and the operation of the train created an unreasonable risk of harm to adjoining property owners and was a substantial factor in bringing about that harm.
(2) The railroad is under a legal duty imposed to protect against the risk of injury from derailment of its cars crashing into adjoining property.
(3) The railroad's conduct was negligent but if not, the C.C. Art. 2317 [We are responsible. . . for the damage . . . caused by . . . things which we have in our custody] concept of strict liability applies where an innocent third party such as this plaintiff suffers damage, unless the railroad can show the harm was caused solely by the fault of the automobile driver (a third person).
The testimony of the railroad employees was in general agreement that
1. The slack action force caused the derailment.
2. A derailment is more than likely to occur in an emergency stop when the train is long; or when empties are placed in front of loaded cars; or when the terrain is of the configuration as it was here.
A cause of plaintiff's injury was the negligence of the automobile driver, but she was not the sole cause in my opinion.
There is unanimity of opinion in this record that the railroad could have done several things to minimize the risk of harm to the plaintiff property owner in this case. There is also unanimity of opinion that for the railroad to do so would be economically impractical because of switching and schedule time.
The majority says there is no present authority which would justify applying strict liability to the facts of this case. I have attempted to point it out.
The majority questions whether the economic burden of loss in these type cases should be shifted from a completely innocent abutting property owner to the railroad who may possibly be in a better position to pass on such losses in increased freight rates. If the rate of occurrence is as miniscule as the majority finds, the burden of the loss being "shifted" is not great or threatening to the continued existence or welfare of the railroad industry.
The risk of harm to an adjoining property owner from a derailment is within the scope of protection of a rule of law which would prohibit a railroad from making a derailment more likely by operating trains of such length, positioning of cars, at such speed and in such locales, where it can be reasonably anticipated that an emergency stop (which would cause a derailment) might become necessary because of the wrongful act of a third party stopping on a crossing within the municipal limits of a city of 200,000 people.
*507 The preferable rule of law in my opinion is negligence, concurrent in this case with the automobile driver. If not negligence, the rule of law derives from the 2317 concept of fault. In any event, the rule should be recognized and applied.
I respectfully dissent.
NOTES
[1] In her original pleadings, Mrs. Gansloser alleged negligence against the railroad in failing to maintain its train equipment in such condition that an emergency application of brakes could be made without a train derailment, and pled the doctrine of res ipsa loquitur. These allegations have been abandoned prior to this appeal.
[1] The conductor, at the rear of a train, may also intentionally place the train into emergency stop.
[2] See distinction and explanation by J. (now Mr. Justice) Tate in Bergeron v. Houston-American Ins. Co., 98 So.2d 723, 725 (La.App. 1st Cir. 1957) writ refused; Hill v. Lundin & Associates, Inc., 260 La. 542, 256 So.2d 620 (1972), and particularly Dialogues on Hill v. Lundin & Associates, Inc., 34 L.L.R. 1.

"Foreseeability is not always a reliable guide, and certainly it is not the only criterion for determining whether there is a duty-risk relationship. Just because a risk may foreseeably arise by reason of conduct, it is not necessarily within the scope of the duty owed because of that conduct. Neither are all risks excluded from the scope of duty simply because they are unforeseeable. The ease of association of the injury with the rule relied upon, however, is always a proper inquiry." Hill, supra, 256 So.2d 622 (footnotes omitted).
[3] The unusual facts were (1) a truck is negligently parked on a dark highway; (2) a negligent motorist violently collides with the truck, and (3) plaintiff, in an attempt to aid the passenger (the motorist's wife with fatal injuries), finds a pistol in the car and gives the pistol to the motorist who then shoots the plaintiff rescuer!!!
[4] See Robertsons, Dialogues on Hill v. Lundin & Associates, Inc., 34 L.L.R. 1.