I., MARVIN, Chief Judge.
In this personal injury action arising out of a train-pedestrian accident that was tried by jury, the plaintiff, Jacob Alen, appeals the dismissal of his action against the railroad and its engineer by the trial court’s JNOV [judgment notwithstanding the verdict] which was based on the court’s finding that a rational jury could not have concluded, as the jury did in what the court labeled “contradictory” answers to verdict interrogatories, that the “train crew members” were not at fault, but the defendant railroad [otherwise and independently ] was at fault (25 percent). Our brackets. The jury allocated 75 percent fault to plaintiff Allen.
Even after viewing the record most favorably toward upholding the jury verdict, we affirm the trial court’s JNOV. La. C.C.P. art. 1811; Anderson v. New Orleans Public Service, 583 So.2d 829 (La.1991); May v. Jones, 28,106 (La.App.2d Cir. 5/8/96), 675 So.2d 275, unit denied.
The facts and inferences which may be drawn on this record do not allow reasonable persons to conclude, as did the jury, that any assumed independent negligent act or omission by the railroad, apart from the arguably negligent conduct of its crew members, was a cause in fact of the accident. The jury’s finding that the train crew members were not negligent cannot be considered clearly wrong on this record, notwithstanding that Alen’s expert witnesses opined otherwise. See Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106 (La.1990); Ball v. Bossier Rural Elec. Memb. Corp., 25,883 (La.App.2d Cir. 6/22/94), 640 So.2d 1382, writ denied.
We review the factual and legal bases of Alen’s contentions that the train crew was negligent and that the defendant railroad was also otherwise negligent, apart from the arguably negligent conduct of its train crew.
|2DISCUSSION

Facts

Allen was injured about 7:10 p.m., shortly after dark on February 11, 1991, while lying partially on the tracks of the Union Pacific Railroad as its southbound train proceeded through Monroe, La. The 5,523 foot train, two locomotives pulling 92 railroad cars, about half of which were loaded, en route from Little Rock, Ak., to Aexandria, La., weighed about 6,800 tons. The train severed Alen’s right hand and left foot as Allen, age 20, lay incapacitated along the railroad track about halfway between two public grade crossings, having been rendered unconscious by alcoholic intoxication and by what he described as a “beating” by unidentified assailants.
Two engineers, a conductor and a brakeman made up the train crew. The operating engineer, Killion, a co-defendant, occupied the control booth on the front right side of the cab in the lead engine. The supervising engineer, Hicks, sat in the front left seat. The other crew members were behind Killion and Hicks.
There were three sets of railroad tracks in the area of the accident, the main track on *1040 which the UP train traveled and two other tracks parallel to and east of the main track. A hotel or motel and several other businesses, including at least three wholesale beer distributorships, were located along the tracks near the Interstate 20 underpass. The Monroe City Hall and Civic Center are some unspecified distance northwest of 1-20. See diagram below.
As the train proceeded southerly at 11 mph, Allen’s body was lying roughly parallel to the track, just outside the left or east rail as seen from the train’s lead engine. Allen’s feet faced northerly toward the approaching train, his head facing the southerly direction in which the train was traveling. While most of Allen’s body was outside the rail, the lower portions of his right arm and left leg rested across the rail. Allen wore a black jacket, black jeans and a white turtleneck shirt. |3One member of the train’s crew, who also noted Allen’s injuries after the accident, said Allen appeared to have been “hugging the rail.”
The crew members, who collectively had more than 70 years of railroad experience, traveled through Monroe regularly, about four times a week. They had encountered pedestrians walking across or along the track in other areas of Monroe, near or at public crossings located near schools and residences, but had never experienced a pedestrian standing or walking on or near the track in the area of this accident, which was primarily developed for commercial use. The train crew members said pedestrians they saw on or near the railroad track in other areas within the municipal limits of Monroe had always moved away from the track when the engineer sounded the tram’s horn. According to this record, no crew member had ever encountered an incapacitated pedestrian lying on or near the tracks either in Monroe or elsewhere.
Allen was roughly halfway between two public grade crossings, in a slight curve in the track, as shown on the diagram below. The weather was clear and dry. The lead engine’s two headlights, which were illuminated on the “bright” setting, complied with federal requirements that the locomotive headlights be capable of illuminating “a person at least 800 feet ahead and in front of the headlight.” Our emphasis.
The headlights were stationary or fixed lights which directed light straight “ahead and in front of’ the locomotive 800 feet or more. A stationary or fixed light meets the federal 800-foot illumination requirement, even though its light does not shine for that full distance on a curved track being negotiated by the train. The track illumination distance in a curve varies with the degree of the curve. For instance, in the curve to the left which existed here, the fixed headlights, while shining 800 or more feet straight ahead of the locomotive, illuminated from 300 to 400 feet of the curved track ahead of the train. The experts discussed this 800-foot | illumination requirement before the jury, explaining that the circumstance of the curve is not a breach of the 800-foot illumination requirement. Allen’s brief and argument on appeal is not contrary to the expert opinion.
This diagram shows the train tracks, other identifiable structures in the area of the accident, and the distance from the accident site to the nearest public grade crossings at South 8th Street and Texas Avenue in Monroe:
*1041 [[Image here]]
IsAfter entering the city limits of Monroe from the north, Killion stopped the train in response to a red signal some 3,200 feet north of the accident site as the train approached what is called an “Interlocking” where UP’s tracks crossed the tracks of another railroad. See diagram. Remaining stopped and observing the red signal for some unspecified time, Killion apparently awaited another southbound train ahead of his train to “clear” the track ahead of him that extended through smaller communities south of Monroe. After receiving radio clearance from UP’s dispatcher which effectively overrode the red signal, Killion caused the train to proceed south under the “restricted speed” requirement, defined by a UP rule as
A speed that will permit stopping within one-half the range of vision!;] short of train, engine, railroad car, stop signal, derail or switch not properly lined, looking out for broken rail, not exceeding 20 mph.[1]
*1042 Once “cleared” by the dispatcher, Killion caused the train to proceed southerly and toward where Allen lay at a much slower speed, 11 miles per hour.
As required at all public grade crossings, Killion sounded the train’s horn and bell as the train approached the crossings at South 10th Street and South 8th Street, which are respectively 1,662 and 870 feet north of where Allen lay. Allen was struck by the train between the South 8th Street crossing and the next crossing at Texas Avenue which is about 700 feet south of the accident site. See above diagram.
When the lead locomotive was some 500 feet south of the South 8th Street crossing and was in the curve about 300^400 feet north of Allen, Killion noticed a “dark object” illuminated by the train’s headlights but which he could not identify at that distance. Killion described this object as being “off to the left” and “near” the east or left rail of the track. On first sighting, Killion immediately alerted other crew members to what he saw, asking loudly, “What’s that?” Killion and the | ;;others surmised, silently or out loud, that the object looked like either a plastic garbage bag or a cross tie. The crew members said they had frequently seen garbage bags and cross ties near and on the railroad track and, by experience, they knew such objects did not pose a risk of harm either to the train or to a human being.
Killion did not slow or attempt to stop the train when he first spotted the dark object near the rail from a distance of 300-400 feet. Killion, on the right side of the locomotive, continued his observation of the unidentified object but lost sight of it as the distance narrowed to about 150 feet when the nose of the engine continued into the curve to Kil-lion’s left, blocking his view.
The supervising engineer, Hicks, was seated and observing the track ahead from the opposite, or front left, side of the locomotive that was nearest to where Allen lay. Having earlier been alerted about the object ahead and near the left rail of the track, Hicks continued to focus on the object. When the nose of the locomotive was about 50 feet, or a car length, away, Hicks realized that the object was a person lying partially on, and not simply near, the rail. Hicks immediately and loudly yelled, “It’s a body,” while quickly departing the cab of the locomotive onto the platform extending to the front or nose of the engine, yelling, as he ran that distance, at the person to get off or move away from the track.
Responding to Hicks’s exclamations and actions, Killion began blowing the train’s horn and applied the train’s “full service” brakes, those which afford the maximum or quickest stopping of the train short of a full “emergency” stop. The experts agreed with Killion that the train, even at 11 mph, would not have stopped within 200 feet of the brakes being applied, whether the full service or the emergency brakes. Killion and the expert witnesses explained that engaging the full service brakes poses less risk of derailing a train of this length, weight and configuration than does a full emergency stop. These factors [configuration of 17cars, weight and length of this train] are also pertinent to resolution of the issue of the railroad’s-arguable negligence, independent of that of the train crew.
Allen did not respond to Hicks’s yelling at him or to the noise of the train’s approach with its horn being sounded with the brakes engaged. After Killion engaged the “full service” brakes, the train’s two engines and at least six freight cars, while slowing from 11 mph in response to the brakes, passed over Allen’s arm and leg before the train fully stopped when the locomotive was some 487 feet south of where Allen lay. In addition to the traumatic amputation of his dominant right hand and his left foot, Allen suffered. facial fractures and lacerations from either or both the tram’s impact and the earlier beating he said he had suffered.
According to hospital records, Allen’s blood contained .22 grams percent alcohol at 8:00 p.m., 50 minutes after the 7:10 p.m. accident. Allen admitted having had “five or *1043 six small [8 or 10 ounce] cups of beer” earlier that evening, after he played basketball at a public playground several miles from his home. The playground was on Powell St., north of 1-20 and east of the railroad tracks. Allen’s home on Lee Ave. was south of 1-20 and west of the tracks. The precise locations of the playground and of Allen’s home were not plotted on any trial exhibit. Allen said he left the playground around 5:45 p.m. to allow sufficient time to arrive home before 7:00 p.m., the time of a family “curfew” set by his foster mother.
Allen said a group of seven or eight black men whom he believed were members of a local gang followed him as he walked home alone and attacked him as he attempted to cross the three sets of railroad tracks, at least two of which he said were occupied by stationary boxcars. Allen said he did not know his assailants, several of whom struck and kicked him in the face and side before delivering a “hard blow” to the back of his head, the last thing Allen said he remembered before waking up in the hospital after being run over by the train. IgAlIen described in much detail at trial his route home, his attempts to elude his attackers and the attack itself.
Allen’s testimony that he “didn’t feel any effects” from the beer he drank at the playground was impeached by the railroad’s witness, Dr. Clyde Elliott, whose expertise includes the absorption and metabolism rates and the physical and mental effects of alcohol. Dr. Elliott estimated Allen’s blood alcohol content at the time of the accident as having been slightly higher than the .22 reading taken at the hospital almost an hour after the accident. According to Dr. Elliott, a person of Allen’s weight and size (160 pounds, slender build) would probably have consumed nine or ten 12-ounce beers to reach that level of intoxication, and would have been noticeably impaired in gait, speech and coordination, with a reduced ability to perceive and respond to external stimuli. Dr. Elliott attributed Allen’s unconsciousness at the time of the accident solely to his intoxication, opining that a person with Allen’s blood alcohol level could not have remembered the details of the alleged eneoun-. ter with and beating by gang members with as much clarity as Allen related to the jury.

The Jury Interrogatories

After a five-day trial, the jury answered ■written interrogatories, the first of which we emphasize:
Do you find that the fault or negligence of the train crew members of Union Pacific Railroad Company was a legal or proximate cause of the accident in question?
By a vote of 9-3, the jury answered no to that first interrogatory.
In apparently unanimous responses to the same question about the respective fault of Union Pacific Railroad Company and of Allen, the jury answered yes in each instance, allocating 25 percent fault to Union Pacific and 75 percent to Allen. The jury awarded Allen his stipulated past medical expenses of $72,000, future medical expenses of $100,000 and $28,000 for his “past and future | ¡¡pain and suffering, disfigurement and disability.” Responding to other interrogatories, the jury awarded zero or nothing in damages for Allen’s past and future mental anguish, for lost enjoyment of life, or for lost past wages and lost earning capacity.
Union Pacific and Allen filed motions for JNOV in the trial court, Allen seeking to have the damage awards increased and UP claiming the lack of an evidentiary basis for the jury’s assessing it with any fault or Lability. The trial court denied Allen’s motion and granted the railroad’s motion for JNOV, finding no rational basis for the jury’s “contradictory conclusion that [the railroad] itself was at fault but none of its individual train crew members were at fault.”
Allen’s appeal questions the trial court’s rulings on the motions for JNOV as well as the jury’s finding of no crew negligence and its quantification of Allen’s fault and his damages. While the greater bulk of his briefs and the primary thrust of his argument on appeal relates to negligence of the crew members [failing to sooner see or recognize Allen in a position of peril on the tracks and proceeding at an excessive speed], Allen also contends that the railroad was negligent, independently of the crew members, in two respects: In failing to inform the crew mem *1044 bers of prior train-pedestrian “accidents and incidents” in the Monroe area and in allowing the train to be “misloaded” [or configured] to the extent that the stopping distance of the train was increased.
We shall address the evidence in the record in the order that plaintiff argues and in the above context: Whether the jury was clearly wrong in finding that the train crew members were not negligent in the respects mentioned and whether, on this record, we may find reasonable, the jury’s conclusion that other employees of the railroad were negligent either or both in failing to inform the train crew members of other pedestrian accidents in the area and in “configuring” or making up the “consist” of the train which ran over Allen.

_[k>Train Crew Negligence

The jury heard conflicting expert testimony on the reasonableness of the crew’s attentiveness and actions as the train approached Allen, who was incapacitated and partially on the track, in the light of some of the rules contained in the railroad industry’s General Code of Operating Rules. The rules discussed by the experts establish specific duties for the train crew in certain circumstances and a general duty of reasonable care in all other circumstances.
Operating Rules: The primary operating rule addressed by the expert witnesses was the “Restricted Speed” rule, quoted supra, p. 5, which governed the train’s speed within the city limits of Monroe. That rule provides that the engineer must be able to stop the train “within one-half the range of vision” of the crew members, “short of train, engine, railroad car, stop signal, [mechanical] derail [device] or switch not properly lined, looking out for broken rail, not exceeding 20 mph.” Our emphasis and brackets.
Notwithstanding that the train’s speed before the accident reached only 11 mph, less than the 20 mph maximum in the restricted speed rule, Allen maintained at trial that the train was traveling at an excessive speed under the circumstances. Allen’s witnesses opined that the presence of Allen’s arm and leg resting across the rail would have interrupted the “shine” of the rail, as would a broken rail, one of the conditions mentioned in the restricted speed rule. Accepting the crew members’ testimony that they could see about 300-400 feet ahead of the train, Allen’s expert witness in train operations and rules, Virginia Tipton, testified that Killion should have been able to stop the train within half that distance, or about 150-200 feet, once he or another crew member saw or should have seen an object giving the appearance of a broken rail. Because the train traveled much farther than this after Killion applied the full service brakes, some 487 feet from where |nAIlen lay, Ms. Tipton opined that Killion was operating the train at an excessive speed and in violation of the restricted speed rule.
The railroad’s expert in train operations and rules, Robert Lee, gave a contrary opinion. According to Lee, the restricted speed rule requires the engineer to be able to stop the train within one-half the crew’s range of vision only when the object ahead is one that is specifically listed in the first part of the rule: train, engine, railroad car, stop signal, derail device or switch not properly lined. The rule merely requires the crew to “look out” for a broken rail, in Lee’s view, and does not mandate that the train be capable of stopping within one-half the crew’s range of vision each time the train approaches an object which is or may appear to be a broken rail.
The expert witnesses discussed only three other operating rules at trial. One rule, entitled “Removing Persons to Place of Safety,” requires the crew members to “guard from engine movements or other dangers ... persons who are evidently intoxicated or mentally impaired [and who] are in the vicinity of tracks or other places where they may be in danger of injury,” and to notify “the proper authorities ... when unable to remove them to a place of safety[.]” Our emphasis and brackets. Allen’s expert, Ms. Tipton, opined that the members of this train’s crew violated this rule. The railroad’s expert disagreed, noting that Allen’s intoxication and mental impairment were not evident to the crew members, as such conditions would be if the crew saw a pedestrian stag *1045 gering or stumbling while walking on or near the track.
The remaining two rules discussed by the experts provide:
(1) SAFE COURSE: In ease of doubt or uncertainty the safe course must be taken; in all cases, the safest available methods must be followed.
(2) TAKING PRECAUTION: Employees must take every precaution to prevent injury to themselves and other persons under all conditions not provided for by the rules....
| igThe experts agreed that these rules simply hold the crew members to a standard of reasonable care under the circumstances when they encounter a situation not expressly governed by a more specific rule.
Under the general standard of reasonable care, Allen’s expert, Ms. Tipton, opined that Killion should have slowed or stopped the train as soon as he or another crew member saw an object in the train’s path which the crew could not identify. Ms. Tipton suggests ed to the jury that the engineer of this train had a duty to slow or stop the train in order to affirmatively identify the object once the object was sighted on or near the track ahead.
The railroad’s expert, Mr. Lee, corroborated the testimony of Killion, Hicks and Ernest Darrington, UP’s local manager of train operations, that the engineer was not expected or required to slow or stop the train until the crew knew or should have known, based on their experience, good judgment and “common sense,” that the unidentified object in the train’s path posed a risk of harm to a person or a physical impediment to the train’s forward movement. According to these witnesses, the engineer need not slow or stop the train each time an unidentified object is encountered on or near the track, but only when the object is or should be recognized as one which, if struck by the train, will or may endanger the train or any person.
The defense witnesses opined that Killion’s duty to slow or stop the train arose only when one or more crew members recognized or should have recognized that the object on the track posed a danger to the train or to any person. Ms. Tipton, on the other hand, opined that Killion should have slowed or engaged the brakes of the train once the object was sighted to determine whether the object posed such a danger.
Braking Distances: The train was traveling 11 mph as it approached Allen before its full service brakes were applied about 50 feet away from him. Allen’s | ^braking expert, John Bentley, estimated the required braking distance of this train at that speed as 225 feet with use of the full service brakes and 202 feet with emergency braking. Bentley’s estimate of the stopping distance with full service braking was significantly less than the train’s actual stopping distance of 537 feet (50 feet before impact and 487 feet thereafter), causing Bentley to opine that Killion must have either applied the brakes only after the train struck Allen, or applied a level of braking less than full service braking of the entire train, perhaps by fully engaging the brakes only on the two locomotive engines while applying a lesser degree of braking pressure to the train’s -92 freight cars.
Stopping distance calculations by the railroad’s braking expert, Robert McRae, were slightly higher than Bentley’s for emergency braking at 11 mph (225-275 feet v. Bentley’s 202 feet) and significantly higher than Bentley’s for full service braking (441-496 feet v. Bentley’s 225 feet). McRae considered Bentley’s full service braking estimates unrealistically low, for reasons he explained to the jury, and testified that the train’s actual braking distance after the accident was consistent with Killion having applied the full service brakes to the entire train some 50 feet before the train struck Allen, as Killion claimed to have done when Hicks shouted to the other crew members that the object ahead was a person’s body.
The experts also calculated the train’s required stopping distance at lesser speeds [9 mph, 7 mph and 5 mph] in both types of braking applications, emergency and full service. The lowest of these figures was 66 feet, according to Allen’s expert, Bentley, with emergency braking at 5 mph. McRae’s calculation for the same speed and braking was higher, 127 feet.
*1046 Allen’s expert, Bentley, admitted that the train could not have stopped short of Allen from a distance of only 50 feet, even in emergency braking and even at a reduced speed of 5 mph. Bentley testified, however, that Killion could have | ^avoided the accident by applying either the emergency brakes or the full service brakes to the entire train as soon as he spotted the unidentified dark object on or near the rail from a distance of 300-400 feet, even with the train traveling at 11 mph. McRae agreed that application of the emergency brakes from that distance would have prevented the accident, but estimated the stopping distance with full service braking at 11 mph as exceeding 400 feet.
As mentioned, the braking experts generally agreed that the train could have stopped short of Allen’s body had Killion applied the emergency brakes at the point in time suggested by Ms. Tipton, while disagreeing over the required stopping distance in full service braking. By either expert’s calculations, however, and even with emergency braking at 11 mph, the crew would have to have recognized and reacted to the fact that the object on the track ahead was a person’s body, that is, that there was a need to stop the train, when the train was at least 202 feet from Allen’s body (Bentley’s figure) and perhaps 225-275 feet away (McRae’s estimate) in order to have stopped short of Allen.
We emphasize that no witness, lay or expert, however, either for Allen or for Union Pacific, testified or suggested that Allen’s body was or should have been recognizable by the crew from a distance greater than 200 feet under the physical circumstances existing at the time of the accident.
Accident reconstruction attempts by both sides were not truly representative of what the crew encountered on the night of the accident and were of little help in determining what the crew members saw or should have seen and affirmatively identified at what distance from the accident site. Even Allen’s expert, Ms. Tipton, a former locomotive engineer for another railroad, gave this testimony:
Q. [D]o you know at what point the crew could have identified Mr. Allen as a person that night?
A. No, I can’t tell you exactly where they could have identified it was [sic] a human being.
|1SQ. All right. And if you’d been out there that night, you don’t know when you could have identified him as a human being either, do you?
A. No.
Considering Allen’s position in relation to the slightly curved track, and notwithstanding the conflicting expert testimony about train operating rules and braking distances, no witness testified that any member of this train crew knew or should have known that the object in the train’s path was an incapacitated person who could not voluntarily move away from the approaching train at an earlier time and • distance than did these crew members.
The jury obviously concluded that the train crew members acted reasonably under the totality of the circumstances, whether under the general or the more specific rules imposing duties on the crew as discussed by the experts. The jury’s finding that the crew members were not negligent is reasonably supported by the record and is not clearly wrong. Sistler, Ball, cited supra. See generally and compare Kaplan v. Missouri-Pacific Railroad Co., 409 So.2d 298 (La.App. 3d Cir.1981); Hollinquest v. Illinois Central Railroad Co., 76 So.2d 568 (La.App. 2d Cir.1954); and Sullivan v. Yazoo & M.V. Ry. Co., 8 So.2d 109 (La.App. 2d Cir.1942).

Independent Negligence

Allen’s claims of independent negligence by the railroad are founded on allegations that the railroad knew, but failed to specifically inform its crew members, of other similar pedestrian accidents in the Monroe area, and that the configuration of the train’s loaded and empty cars contributed to Killion’s decision to engage the train’s full service brakes rather than the emergency brakes, which would have stopped the train more rapidly. Allen’s contention that Killion acted unreasonably in his choice of braking applications was impliedly rejected by the liajury in its verdict answer that no member of the train crew was at fault or negligent.
*1047 The jury, perhaps seeing merit in one or both claims of Union Pacific’s fault or negligence, or perhaps out of sympathy for the seriously injured plaintiff, assessed the railroad with 25 percent fault after finding that the train crew was not negligent.
The trial court, by granting the railroad’s motion for JNOY, obviously disagreed with the jury’s finding of the railroad’s independent negligence.
JNOV Review: In reviewing the trial court’s ruling on the JNOV motion, we inquire whether the facts and inferences established on the record point so strongly in favor of the railroad that reasonable men and women could not have reached the conclusion reached by the jury. La. C.C.P. art. 1811; Anderson, May, cited supra.
When reasonable, fair-minded and impartial jurors could validly reach different conclusions from the evidence in the record, the trial court should deny the motion for JNOV. Anderson. The motion is properly granted only when the jury verdict is unsupported by any legitimate or substantial evidence, that is, when there is no valid line of reasoning and permissible inferences which could possibly lead rational men and women to the conclusion reached by the jury. Roland v. Tedesco, 616 So.2d 780 (La.App. 2d Cir.1993), unit denied.

Other Pedestrian Accidents

Killion, the train’s operating engineer, gave this testimony at trial:
Q. Mr. Killion, would you as an engineer operating this train for the Union Pacific, would you have wanted to know ... how many instances there were of the special agents for the railroad company [sometimes called the “railroad police”-] running people off of the track in this area?
A. Yeah, I would like to know. Anything that would help me operate my train safely and yeah, I would like to know.
Q. But you didn’t know that, did you?
| i7A. I only knew of a few instances [via] radio [communication with the operator of] a train [that] has gone on ahead of me.... [I]f ... some kid or some grown person ... has separated his train while he’s stopped and when he got ready to move, it came in two, he will call and say they’re pulling pins at the Thomas Street [crossing] and then we know to take even more precautions by doing a little tactic that we call stopping with your train stretched, so it’s impossible to pull a pin. You know, we do things like that.
Q. Well, if you receive radio contact that there [are] kids down there pulling pins, what do you do on the approach? Do you get ready to stop much quicker?
A. Oh, once you are in the [city] limitfs] then you’re going to stop anyway. You know, you’re already preparing to stop.
* * * * * *
Q. [W]ould you have wanted to know if there had been accidents in this area before that night?
A. Certainly.
Q. Okay. Would you have expected management to communicate those to you, particularly if they occurred on other crews?
A. [Yes.]
Q. Did you or did you not know of accidents in this area before that night, pedestrian accidents, yes or no, please?
A. Not before this night, no, sir, I knew of no train/pedestrian accidents[.]
(Our emphasis and brackets.)
Killion was not asked what he would have done differently on the night of the accident had he known of other pedestrian accidents or incidents in the Monroe area.
Allen’s expert in train operations, Ms. Tip-ton, testified:
Q. ... If you were an operating locomotive engineer, would you want to know from management if an area was having pedestrian traffic?
A. Yes.
Q. And for instance, if this area involved the [Monroe] civic center, you would want to know that, would you not?
A. Yes.
Q. And to what extent you might have to expect pedestrians in that area on any given day, correct?
I igA. Yes.
*1048 Q. Would you also want to know if there had been other accidents in your area?
A. Yes.
Q. Do you feel it is the responsibility of a [railroad company’s] management ... to tell these things to the crew members? A. Well, it’s my opinion and it works out because a train operates in the past, the present, and the future that the more knowledge that you have ... about an area the better you can operate your train and the safer you can get through there. (Our emphasis and brackets.)
Allen argued to the jury that Ms. Tipton’s testimony established a duty on the part of the railroad, over and above its general duty to inform and warn its crew members of matters relating to railroad safety, to specifically inform this crew of other similar pedestrian accidents in the Monroe area. Ms. Tipton’s general comments, above quoted, do not support Allen’s argument.
The questions asked of Killion and Ms. Tipton — Would you have wanted to know of other pedestrian accidents and incidents in the Monroe area? — were either expressly, as noted, or impliedly, conditioned on an assumed fact: If such accidents had occurred. The underlying or assumed “conditional fact,” however, that such accidents [plural] had occurred, is not established in this record.
Even when viewed in the most favorable light, the record does not show, but negates, the conditional or assumed “fact” that other similar accidents had occurred in this area of Monroe. Without proof of the assumed “fact,” the railroad’s failure to specifically inform its crew members of other pedestrian accidents cannot reasonably be regarded as a cause in fact of this accident.
The Assumed “Fact”: Allen introduced in evidence more than 80 internal Union Pacific [UP] “Field Investigation Reports” of pedestrian incidents in Monroe for the period February 1988 — May 1990 which were investigated by the UP Railroad Police, sometimes called “special agents.” More than two-thirds of | i9these incidents involved persons walking through the UP rail yard located at Milepost 502.9, Pk miles south of the site of Allen’s injury at Milepost 501.4. Some of these “trespassers” were arrested for burglary or theft, while others were “warned and released.” The remainder of the pedestrian incidents occurred at Milepost 525, about 2k miles south of where Allen was injured, under similar factual circumstances and dispositions. There is no evidence, in the reports or otherwise, that any person involved in these incidents was accidentally injured by a train.
The record establishes only one prior pedestrian accident in the Monroe area, in October 1990, which occurred when a man who was “suspected to have used alcohol” and who was walking along the railroad tracks about 1/10 of a mile from where Allen was injured, stumbled or fell into the steps on the side of the passing locomotive and bruised his head. This accident, like Allen’s, is described in a UP “Personal Injury Report,” which we distinguish from the Field Investigation Reports mentioned earlier.
The only other pedestrian accident reported occurred in July 1993, some 18 months after Allen’s accident, when a slow-moving train struck a man who was sitting on the rail and who did not move away when the engineer sounded the train’s horn. This later accident, which occurred within a mile of the site of Allen’s accident, is described in a UP “Grade Crossing Accident/Incident Report.”
The one prior accident (on the locomotive steps) was factually similar to Allen’s accident in some respects (location near the track and actual or suspected use of alcohol by the pedestrian), and dissimilar in greater respects (conscious though perhaps intoxicated pedestrian walking along track falling into the steps on the side of the moving locomotive v. totally unconscious or incapacitated pedestrian lying near and partially on track ahead of the locomotive). Allen’s counsel did not relate any of the particulars of the locomotive-steps accident or ask ^questions about this accident to the members of this train’s crew before the jury, however. No crew member was asked or testified to what, if anything, he would have done differently on the night of this accident had he been informed by UP of the details of that one locomotive-steps accident.
*1049 The evidence in this record cannot reasonably be construed as substantiating the assumption that other factually similar pedestrian accidents [plural] had, in fact, occurred in the Monroe area before Allen’s accident, nor as allowing the inference that Union Pacific knew of these accidents but failed to specifically inform its employees of their occurrence. There is no contention that the crew members were not generally instructed as to safety measures regarding train movement, speed, warning devices, headlights and objects or people on or near the track ahead of a moving train.
When a witness’s testimony is based on assumed facts which are not proven by other competent evidence, the testimony has no probative value and should be disregarded by the trier of fact. See and compare Harris v. Williams, 28,512, p. 24 (La.App.2d Cir. 8/23/96), 679 So.2d 990, 1003-04, and eases cited therein.
Assuming the Duty: Even should we ignore our review and our above conclusions and assume, for the sake of argument, that reasonable jurors could have concluded that employees of UP, other than this train’s crew members, had and breached some duty to this plaintiff, the evidence fails to show that the crew members’ lack of knowledge of other similar accidents substantially contributed to, or was a cause in fact of, this accident. Proof of cause in fact — that the plaintiffs harm would probably not have occurred “but for” the defendant’s substandard conduct — is an essential element of recovery in a negligence case, even when the elements of duty and breach have been shown. Weaver v. Valley Elec. Memb. Corp., 615 So.2d 1375 (La.App. 2d Cir.1993); Fitzgerald v. Files Timber Co., 29,145 (La.App.2d Cir. 1/22/97), 687 So.2d 674, urrit denied, and cases cited therein.
Killion and Ms. Tipton testified only that they “would have wanted to know” of other similar train-pedestrian accidents in the area. Neither Killion nor any other member of this train’s crew was asked, however, whether or how this knowledge would have factually changed the sequence of the crew’s conduct leading up to Allen’s injuries. The jury did not find the crew members at fault or negligent in any respect. We are here considering UP’s fault or negligence apart from the fault or negligence of the train crew members, who arguably, according to Allen, should have been proceeding slower than 11 mph, assuming or anticipating that any object, not otherwise identified, on or near the tracks is an incapacitated pedestrian, and engaging the brakes of the train on first sight of an unidentified object on or near the tracks.
Simply put, the train crew saw within the 300-400 foot illuminated curving track ahead of the train the object on or near the track when they should have seen it. The jury obviously did not accept Allen’s argument, but categorically concluded in answering the first interrogatory that the crew members acted reasonably and were not negligent in proceeding too fast or in failing either, at first sight, to identify, or to attempt to stop and determine whether, the object on or near the track ahead of the train was a human being.
Foreseeability: In essence, Allen is contending it should have been reasonably foreseeable to the railroad that pedestrians would be on or near the track through Monroe and the crew should have been alerted by other employees of the railroad so that the crew would be better prepared to guard against the risk of injury to a pedestrian. While foreseeability does not control, it is a factor to be considered in resolving the legal and factual issues in a negligence case, and is sometimes weighed by the rate of irequency of the particular risk. See Gansloser v. Kansas City Southern Ry. Co., 339 So.2d 498 (La.App. 2d Cir.1976), Marvin, J., dissenting. This train crew, with a total of more than 70 years experience, stated that some pedestrians are noticed as the train travels through populated communities, including Monroe, but that the pedestrians they had encountered had always responded to the train’s approach and signals and had been able to get out of the way of the approaching train.
In summary, we have no evidence of the rate of frequency of train-pedestrian accidents [how many pedestrians have been injured by trains in any given area in any *1050 given time] other than the one locomotive-steps injury. The record does not show or suggest that the time, distance, perception or reaction factors of the train crew would have been more favorable to Allen had the crew members known of one factually remote pri- or train-pedestrian accident in Monroe [possibly alcohol-impaired pedestrian falling into the steps on the side of a passing locomotive].
It simply is not reasonable to conclude on this record that UP’s failure to inform this crew of the locomotive-steps accident was a substantial cause in fact of Allen’s harm, that is, that the harm would probably not have occurred “but for” UP’s asserted “failure.” Fitzgerald, supra. This record does not present conflicting evidence on the cause in fact issue, but is entirely lacking as to that essential element of recovery. Roland, supra.

Configuration of Train

The configuration or “consist” of the train’s 92 freight cars was a mixture of loaded and empty cars, 42 loads and 50 empties, 5,528 feet in length with the locomotives. Twenty-six of the 42 loaded cars were at the rear of the train. The remaining 16 loads were scattered among the empty cars in the front and middle sections of the train. Each railroad car making up a train has about six inches of | gaspace in its connections to other cars, being designed in that fashion to facilitate coupling and uncoupling, according to experts.
All witnesses agreed that a train’s brakes “set up” more quickly on empty cars than on loaded cars when the train is stopped, whether in full service or emergency braking, the top two of six braking procedures available on this UP train. When, as here, a relatively large amount of the train’s weight is at the rear of the train, application of the brakes will cause the rear cars to “run in” toward the lighter cars in the middle section of the train and then run back out, causing a “yo-yo” or “slack action” effect which may damage the freight cars or jackknife the train. This “slack action,” run-in, or bumping together of cars because of the space in connections, is always present and may be either gentle or severe, depending on the engineer’s regulation of the throttle and the brakes to effect a stop and on the configuration of loaded and unloaded cars in the train.
A sudden stop is more likely to produce damaging slack action than is a gradual stop. Use of the emergency brakes poses the greatest danger of run-in damage, though some degree of run-in occurs even with full service braking. Here, the slack action when Killion applied the full service brakes was strong enough to knock the train’s brakeman to the floor of the engine cab, but not to damage the cars.
Allen’s expert, Ms. Tipton, opined that the configuration or consist of the train was improper and in violation of an industry rale. The content of such a rale was not placed in evidence. According to Ms. Tipton, the placement of 26 loaded cars at the rear of the train required Killion to consider the potential for damaging the train when faced with a decision about what braking system to employ, full service or emergency. Killion agreed with Ms. Tipton’s statement in a broad sense, admitting that he must always take into account the car configuration or consist and the anticipated slack action or run-in of any train he operates.
[ ^Killion did not say or agree, however, that this train’s consist had any bearing on his decision to proceed ahead, rather than applying either the full service brakes or the emergency brakes, when he first spotted an object on the track ahead from a distance of 300-400 feet. Killion said he reached the decision to continue slowly ahead at 11 mph on the sole basis that the object was not then recognizable as one creating a need for him to stop the train. In other words, Killion did not say, suggest or agree that he would have applied the tram’s brakes sooner than he did but for the manner in which the train’s cars were configured.
The defense expert, McRae, testified that the car configuration of this train added about 50 feet to its required stopping distance, at any speed and with either type of braking. McRae opined that the required stopping distance for the train in emergency braking at a speed of 11 mph was 225 feet without allowing for the car configuration, *1051 and 50 feet more, or 275 feet, with an allowance for such a configuration.
The same calculation by Allen’s expert, Bentley, was lower, 202 feet. This figure includes an allowance for the train’s slack action, but Bentley did not quantify the additional stopping distance as did McRae.
Given that the train was only 50 feet away when Hicks realized Allen’s identity and Killion applied the brakes, too close for the train to stop short of Allen even by Bentley’s calculations, and given the lack of evidence that Killion would have attempted to stop the train sooner but for the train’s consist, the manner in which the cars were configured by the railroad simply may not be regarded as a substantial factor in causing or contributing to Allen’s injuries. Even without the train’s car consist or configuration adding to the stopping distance of the train, the accident could not have been avoided, according to this record, when the crew realized that the object on the track 50 feet ahead was a person.
12rAfisuming arguendo the railroad’s breach of a duty independent of the crew’s conduct, the railroad’s assumed substandard conduct in the makeup or configuration of the train is not shown on this record to have been a substantial factor in bringing about the harm suffered by Allen, a factor but for which the accident would not have occurred. See and compare the factual circumstances discussed in Gansloser v. Kansas City Southern Ry. Co., supra. Again, the evidence on whether the configuration of the train was a cause in fact of Allen’s injuries is not conflicting, but instead, is not presented in this record. Fitzgerald, supra.
As to both claims of negligence by the railroad, apart from the arguable negligence of the train crew, the record supports the trial court’s grant of JNOV. Anderson, May, Roland, cited supra.
DECREE
The judgment notwithstanding the jury verdict, dismissing the action with prejudice, is affirmed. Costs of the appeal are assessed to Allen.
AFFIRMED.

. The rule, as reproduced and introduced in evidence by Allen, contains the semicolon which we have bracketed. According to the railroad's expert witness, however, the semicolon was deleted *1042 when the General Code of Operating Rules was revised in 1985, several years before this accident.